## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| F.C.C., on his own behalf and on behalf of his minor child, A.C.L., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.    2:22-cv-05057 |
| United States of America | ) ) | |
| Defendant. | ) ) | |

## **COMPLAINT**

This complaint seeks to hold the United States Government accountable for its cruel, illegal, and inhumane treatment of F.C.C. and his then seven-year-old daughter A.C.L., who arrived at the United States border seeking asylum, only to be forcibly separated from each other for several months.[1]  The United States Government purposefully inflicted severe and long-lasting trauma on F.C.C. and A.C.L. as part of the "zero tolerance" policy aimed at deterring migrants from requesting asylum in the United States.

Executive branch officials purposefully separated families like F.C.C. and A.C.L. to inflict trauma upon them and deter future asylum seekers.  Federal officials at the highest levels have made repeated statements acknowledging that deterrence was the purpose of the family separation policy.[2]

---

[1] To protect Plaintiffs' identities, they will be referred to using their initials F.C.C. and A.C.L. Plaintiffs will file a separate motion to proceed with pseudonyms.

[2] *See, e.g.* Philip Bump, Here Are the Admin. Officials Who Have Said that Fam. Separation Is Meant as a Deterrent, WASH. POST, June 19, 2018, https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

## INTRODUCTION

1.     When federal agents separated A.C.L. from F.C.C., she was only seven years old. A.C.L. clung to her father, screaming that she did not want to be taken away from him.  Officers forcibly pulled A.C.L. from her father and carried her out of the room.  F.C.C. was forced to watch, helplessly, as his daughter was taken away.  F.C.C. had no idea it would be months before he saw her again.

2.     F.C.C. and A.C.L. fled Honduras after a series of violent assaults in their hometown of Olancho, including the murders of several of F.C.C.'s family members.  They arrived at the United States border near Florence, Arizona and peacefully turned themselves over to United States Customs and Border Patrol ("CBP") agents and were taken to an immigration detention facility.  Just two days later, they were forcibly separated pursuant to the Government's cruel and unconstitutional zero tolerance policy.

3.     A.C.L.'s forced separation from her father was part of an inhumane policy instituted by the Government intended to deter migrant families from lawfully seeking asylum in the United States.  Moreover, this appalling policy was implemented without any procedure for tracking children who had been separated from their parents.  *See L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018), *modified on other grounds*, 330 F.R.D. 284 (S.D. Cal. 2019).

4.     Under the zero tolerance policy, the Government unnecessarily separated at least 4,200 children from their families.[3]  The Government instituted this policy with the goal of inflicting severe harm on the children and their families to deter others from seeking asylum.

---

[3] Lelia Rafei, *Fam. Separation, Two Years After Ms. L*, ACLU, Feb. 26, 2020, https://www.aclu.org/news/immigrants-rights/family-separation-two-years-after-ms-l

Former Secretary of the U.S. Department of Homeland Security and then-Chief of Staff to the President, General John Kelly, stated that "a big name of the game is deterrence," and that separating children from their parents "would be a tough deterrent."[4]

5.      Shortly after being taken away from her father, seven-year-old A.C.L., who had rarely spent time outside of rural Honduras, was put onto an airplane and sent to a shelter for unaccompanied minors in Syosset, New York.  Having never been on an airplane before, A.C.L. had no idea where she was or where she was going.

6.      Meanwhile, F.C.C. remained in the detention center in Arizona.  CBP officers told him that A.C.L. was being taken to a different portion of the same facility.  However, five days after she was taken away, F.C.C. received a phone call from a detention facility in New York.  This was when F.C.C. learned for the first time that his young daughter was no longer in the same facility as him, nor even in the same state.

7.      Apart from the intense trauma of the initial separation, the Government inflicted additional pain and suffering on F.C.C. and A.C.L. by failing to provide information of A.C.L.'s whereabouts or well-being, failing to facilitate adequate communication between A.C.L. and her parents during the separation, and failing to implement a tracking system that would have allowed for the speedy reunification of A.C.L. with her parents.

8.      In addition to the unnecessary initial separation, A.C.L. and F.C.C.'s suffering and trauma was unnecessarily prolonged because the Government kept A.C.L. detained in New York for approximately four months even though it knew her parents' identity and that they sought to be immediately reunited.

---

[4] *See* Bump, Supra Note 2.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346(b)(1), and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680.

10.      On April 24, 2020, F.C.C. and A.C.L. submitted administrative claims to the U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Department of Health and Human Services ("DHS").  None of the agencies have made a final disposition on either F.C.C. or A.C.L.'s administrative claim.  Because six months have passed since the submission of those claims, they are deemed finally denied.  28 U.S.C. § 2675(a).  F.C.C. and A.C.L. have therefore exhausted all potential administrative remedies.

11.      Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts and omissions that give rise to this action took place in this judicial district.  A.C.L. was detained, away from her family, for four months in Syosset, New York.

## PARTIES

12.      Plaintiffs F.C.C. and A.C.L. are Honduran nationals who currently reside in the United States.  In 2018, they fled to the United States seeking asylum.  Shortly after their arrival, they were separated from each other.  F.C.C. was deported to Honduras while seven-year-old A.C.L. remained in New York, separated from her family, for several months.

13.      Defendant the United States of America is the appropriate defendant pursuant to the FTCA.  28 U.S.C. §§ 1346(b), 2671, *et seq.*

14.      Defendant acted through DHS and HHS, which are federal agencies of the United States pursuant to 28 U.S.C. § 2671, and their employees, officers, and agents, including but not

limited to CBP and ICE, which are sub-agencies of DHS under the direction, authority, and control of the Secretary of Homeland Security, and the Office of Refugee Resettlement ("ORR"), a sub-agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services.

15.     The federal officers referenced in this Complaint were, at all relevant times, employees of the United States, working within the course and scope of their employment with the federal agencies listed above.

16.     DHS employees were responsible for separating F.C.C. and A.C.L.  DHS employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Arizona where F.C.C. and A.C.L. were detained and separated, and where F.C.C. remained after A.C.L. was taken away from him.

17.     HHS employees were responsible for supervising and managing the detention of children classified by the Government as unaccompanied, including those children at the New York facility where A.C.L. was detained after she was separated from her father.

18.     High-ranking officials from DHS and HHS worked together to design and promulgate the unlawful zero tolerance family separation policy that caused extreme harm to F.C.C. and A.C.L.

19.     At all relevant times, all DHS employees referenced in this Complaint who interacted with F.C.C. and A.C.L. were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## FACTUAL ALLEGATIONS

**A.     The Government's Family Separation Policy**

20.     United States law permits non-citizens who have entered the United States to seek asylum and related humanitarian relief.[5]  If an individual indicates that he or she wishes to seek asylum or fears return to their home country, he or she must be referred to an asylum officer to evaluate whether he or she has a credible fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(ii).  If the officer determines that he or she has established a credible fear, then he or she is placed into removal proceedings and can file an application for asylum and other humanitarian relief.  8 U.S.C. § 1225 (b)(1)(B)(ii); 8 C.F.R. § 235.6(a)(1)(ii), (iii).

21.     Alternatively, an asylum seeker can be placed directly into removal proceedings by being issued a Notice to Appear, which provides the individual with a future date to appear in immigration court.  *See* 8 U.S.C. §§ 1225(b)(2), 1229(a).

22.     Under certain circumstances, individuals may be subject to expedited removal, in which they are deported from the United States without having a full hearing before an immigration judge.  8 U.S.C. § 1225(b)(1)(A)(i).  However, individuals who have expressed an intention to apply for asylum or a fear of persecution are not subject to expedited removal.  *Id.*

23.     Prior to the family separation policy, when a parent with a minor child encountered CBP at or near the border, they were generally kept together.  Sometimes these families were detained, and sometimes these families were permitted to enter the United States while awaiting their immigration proceedings.

---

[5] *See* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3); Convention Against Torture, 8 U.S.C. § 1231 note (U.S. Policy with Respect to the Involuntary Return of Persons in Danger of Subjection to Torture); 8 C.F.R. § 208.1(a).

24.     In contrast, children who arrived at the border without an adult, known as "unaccompanied minors," would generally enter the custody of ORR.  ORR would care for these unaccompanied minors in a shelter or release them into the care of a relative or foster family.

25.     The Trump Administration was particularly focused on limiting the number of individuals seeking asylum at the United States' border.[6]  The Government developed the Family Separation Policy with the goal of causing families severe emotional harm in the hope that this would deter other families from coming to the United States and seeking asylum.

26.     Prior to the enactment of the Family Separation Policy, the Government understood that implementing such a policy would cause severe trauma to impacted families. Indeed, the Government enacted the policy specifically intending to cause such harm.[7]

---

[6] *See*, *e.g.*, U.S. Judge Bars Trump Admin. From Enforcing Asylum Ban, CNBC, Nov. 20, 2018, https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Nick Miroff & Josh Dawsey, The Advisor Who Scripts Trump's Immigr. Policy, WASH. POST, Aug. 17, 2019, https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, While Migrant Fams. Seek Shelter From Violence, Trump Admin. Narrows Path to Asylum, TEX. TRIB., July 10, 2018, https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Maria Sacchetti, Felicia Sonmez & Nick Miroff, Trump Tightens Asylum Rules, Will Make Immigrs. Pay Fees to Seek Humanitarian Refuge, WASH. POST, Apr. 30, 2019, https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a-33217240a539_story.html; Glenn Thrush, U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border, N.Y. TIMES, Jan. 24, 2019, https://www. https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, Trump Admin. Moves to Curb Migrants' Asylum Claims, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum-idUSKCN1ND35K; Shaw Drake & Edgar Saldivar, Trump Admin. Is Illegally Turning Away Asylum Seekers, ACLU, Oct. 30, 2018, https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers.

[7] Policy Options to Respond to Border Surge of Illegal Immigr. (Dec. 16, 2017) (available at https://www.documentcloud.org/documents/5688664-Merkleydocs2.html) (hereinafter "Policy Options").

27.     In 2016, a DHS Advisory committee report found that "the separation of families for purposes of immigration enforcement or management, or detention, is never in the best interest of children," and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child – which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[8]

28.     Additionally, in September 2016, the DHS Advisory Committee on Family Residential Centers issued a report that stated that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS."[9]  The report stated explicitly that the "separation of families for purposes of immigration enforcement or management or detention is never in the best interest of children."[10]

29.     Further, Commander Jonathan White, the former Deputy Director of ORR for the Unaccompanied Alien Children's Program testified that, as early as February 2017, he warned Administration officials that a policy of separating children from their parents had "significant potential for traumatic psychological injury to the child."[11]

30.     Moreover, prior to the implementation of the family separation policy, the American Academy of Pediatrics responded with a statement opposing DHS's proposed family separation program, warning:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek

---

[8] U.S. Immigr. & Customs Enf't, Dep't of Homeland Sec., Rep. of The DHS Advisory Comm. on Fam. Residential Ctrs. (Sept. 30, 2016) at 2, 10, https://perma.cc/TZ9C-CUMC.

[9] *Id.* at 10.

[10] *Id.* at 2.

[11] Examining the Failures of the Trump Admin.'s Inhumane Fam. Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Com., 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), available at https://youtu.be/OPPncPb50QE?t=73.

refuge in the United States is not exacerbated by the additional
trauma of being separated from their siblings, parents or other
relatives and caregivers.  Proposals to separate children from their
families as a tool of law enforcement to deter immigration are harsh
and counterproductive.  We urge policymakers to always be mindful
that these are vulnerable, scared children.[12]

31.     Nonetheless, in July 2017, the Government piloted a family separation program in
the Customs and Border Patrol El Paso sector.  Rather than keep migrant families together as it
had previously done, the Government separated parents from their children, detained the parents,
designated the children as unaccompanied minors, and then put the children into the custody of
the Office of Refugee Resettlement ("ORR").

32.     Shortly after the pilot program ended, in December 2017, officials at the
Department of Justice and DHS exchanged a memorandum that was titled "Policy Options to
Respond to Border Surge of Illegal Immigration."[13]  Two policies in the memorandum were
entitled "Increased Prosecution of Family Unit Parents" and "Separate Family Units."  The
policy in the memorandum stated that parents would be prosecuted for illegal entry, and then
their minor children would be placed in HHS custody as unaccompanied.  The memorandum
explained that "the increase in prosecutions would be reported by media and it would have
substantial deterrent effect."[14]

---

[12] Press Release, Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, AAP Statement
Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017),
https://www.aap.org/en/news-room/news-
releases/pediatrics2/2017/immigrantmotherschildrenseparationv/

[13] Policy Options, Supra Note 7; *see also* Julia Ainsley, Trump Admin Weighed Targeting
Migrant Families, Speeding Up Deportation of Children, NBC NEWS, Jan. 17, 2019,
https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targetingmigrant-
families-speeding-deportation-children-n958811 (explaining that the December 2017 policy
options draft plan was made public by the office of Senator Jeff Merkley).

[14] *Id.*

33.     On April 6, 2018, President Trump issued a memorandum entitled "Ending 'Catch and Release' at the Border and Directing Other Enhancements to Immigration Enforcement."[15]  "Catch and Release" refers to the policy of allowing migrants to await their asylum hearings in the community, rather than in immigration detention.[16]

34.     The same day President Trump issued his memo, then-Attorney General Jeff Sessions announced that the Government would institute a "zero tolerance" policy, which mandated the prosecution of all persons who crossed the United States border between ports of entry.[17]  This extended the practices of criminal prosecution and family separation that had been tested in El Paso.  The Administration promptly began separating families along the border.

35.     The express purpose of the zero tolerance policy was to deter Central Americans, like Plaintiffs, from coming to the United States.[18]  The Administration planned to deter additional people from coming to the United States by inflicting severe emotional trauma on the families that were arriving at the border.  Former Attorney General Jeff Sessions had attacked asylum as "an easy ticket to illegal entry into the United States."[19]

36.     After the policy was implemented, the Government cruelly and unnecessarily separated families shortly after they entered the United States.  The Government subsequently treated these children as "unaccompanied" and placed them in the custody of ORR at shelters

---

[15] 83 Fed. Reg. 72, 179 (Apr. 13, 2018).

[16] *Id.*

[17] *See, e.g.*, Supra Note 5.

[18] Stacy Sullivan, We Shouldn't Take the Bait On 'Catch and Release', ACLU, July 20, 2018, https://www.aclu.org/blog/immigrants-rights/immigrants-rights-and-detention/we-shouldnt-take-bait-catch-and-release

[19] Jeffrey B. Sessions III, Remarks to the Executive Office for Immigration Review (Oct. 12, 2017) (transcript available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review).

and/or with foster families, even though the children were <u>not</u> unaccompanied and had arrived with adult family members who desperately wished to care for them.

37.     Disturbingly, in addition to unnecessarily separating children from their parents, the Government did not implement any kind of system to track where children went after they were separated or who their parents were.  This caused additional unnecessary anguish and prolonged separation, requiring a subsequent extended effort to reunite parents with their children in the weeks, months, and years after the initial separations.

38.     This policy intentionally inflicted trauma on parents and their children by forcibly separating families, providing them insufficient information about the whereabouts and well-being of their loved ones, and needlessly prolonging the separation of these families.

39.     The Trump Administration knew the policy would cause trauma to families and implemented it with the specific goal of deterring migrants from coming to the border.  Indeed, John Kelly, who was President Trump's Chief of Staff, stated that "a big name of the game is deterrence."[20]

40.     The Government put little thought into what would happen to the children affected by this policy, with Mr. Kelly callously stating "[t]he children will be taken care of --- put into foster care or whatever."[21]

41.     The Administration ignored all of the warnings and the scientific and medical evidence demonstrating the harm and long-lasting trauma of family separation.  The

---

[20] Bump, Supra Note 2.

[21] Interview by NPR with John Kelly, White House Chief of Staff (May 11, 2018) (transcript available at https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

Administration acted intentionally, and/or recklessly and unreasonably by implementing family separation policies, which are known to cause permanent emotional and behavioral problems.[22]

**B.     F.C.C. and A.C.L. Come to the United States Seeking Asylum**

42.     F.C.C. and A.C.L. are from the rural town of Olancho, Honduras.  They fled Olancho after a series of violent assaults perpetrated by violent groups in the town, including murders of F.C.C.'s family members.  After the murders of a number of family members and learning about death threats directed towards himself and his family, and with a lack of protection by Honduran law enforcement, F.C.C. fled Honduras with his daughter A.C.L.

43.     On May 1, 2018, F.C.C. and A.C.L. arrived at the United States border near Florence, Arizona.  They crossed the border and turned themselves over to CBP agents. F.C.C. provided the agents with identification documents for himself and his daughter.

44.     The CBP agents put F.C.C. and A.C.L. in a van and drove them to the Florence Correctional Center, where they were placed in a cold holding cell, which is frequently referred to as *la hielera* (the "ice box" in Spanish).  F.C.C. and A.C.L.'s personal items were taken away and they were provided with a foil sheet, instant soup for meals, and packets of soap.

45.     In *la hielera*, there was no place to sit or lie down other than the concrete floor. The foil sheet did little to ward off the cold.  Although they had been provided with soap packets, F.C.C. and A.C.L. were not allowed to shower.  *La hielera* had a small square window that did not open; A.C.L. complained to her father about the freezing cold and asked repeatedly to go back to her mother.

46.     On their second day in *la hielera*, F.C.C. and A.C.L. were taken to another room by CBP agents, who had stated that they needed to sign documents.  Once in the other room, the

---

[22] Press Release, Supra Note 17.

agents told F.C.C. he was going to be punished because he had previously been deported.  In the presence of A.C.L., the agents informed F.C.C. that he was going to be deported and that A.C.L. was going to be transferred to another detention station in the facility.

47.     F.C.C. explained that they had come to the United States seeking asylum.  F.C.C. showed the agents his family members' death certificates, but the CBP agents were uninterested and unmoved.

48.     F.C.C. was informed that A.C.L. would remain in the same facility but could not stay with him, though he would be permitted to see her twice per week.  Two officers came in to take her away.  A.C.L. sobbed and clung to her father, screaming that she did not want to be taken away from him.  The officers physically ripped A.C.L. from her father and carried her out of the room.

49.     F.C.C. was heartbroken.  He felt that it was his fault that A.C.L. had been taken away from him, and he was devastated thinking about how he would tell A.C.L.'s mother.  F.C.C. was depressed and could not eat, constantly worrying about A.C.L.

**C.     F.C.C. Remains in Arizona and Is Later Deported**

50.     After A.C.L. was taken away, F.C.C. remained in detention in Florence.  He provided the officials with A.C.L.'s paperwork and birth certificate as well as the phone number of his wife, who remained in Honduras.

51.     Distraught, F.C.C. could not stop thinking about the whereabouts and wellbeing of A.C.L.  He was given only the foil sheet for warmth and instant soup to eat, but his concern was solely about A.C.L.  He frequently asked the guards for updates and was told that she was "okay" and that she would be going back to Honduras with him.

52.     Five days after the separation, F.C.C. received a phone call from a detention facility in New York.  The personnel at the detention center informed him that the phone number he had provided to contact his wife had been lost and requested that he provide the phone number again so that A.C.L.'s mother could be contacted.

53.     It was through this phone call that F.C.C. realized that A.C.L. was no longer at the detention facility with him, and was instead in a place called New York.  F.C.C. did not know where New York was or the distance between New York and Arizona

54.     When F.C.C. and A.C.L. finally were able to speak on the phone, they both were distraught.  A.C.L. sobbed that she wanted to go back home.

55.     After the phone call, A.C.L.'s social worker reported in her notes that both A.C.L. and her father had requested immediate departure so they could be reunited as soon as possible.

56.     Not long after the phone call with A.C.L., F.C.C. was deported back to Honduras. F.C.C.'s deportation order was in English and he was provided with no translation or explanation; he signed it without knowing what would happen next.  F.C.C. constantly inquired about A.C.L.'s whereabouts.  Some officers told him that A.C.L. would be returning to Honduras with him, while others told him she was on a different plane.

57.     Although he did not resist the officers, F.C.C. was handcuffed and taken to an airport, where he was put on a plane.  He remained in handcuffs until he arrived in Honduras. After his arrival, officers told him that A.C.L. would also be arriving.  F.C.C. only learned that A.C.L. would not be arriving after he reunited with his wife in Honduras.

**D.    A.C.L. Is Taken to A Shelter in New York**

58.    Unbeknownst to F.C.C., on May 3, 2018, A.C.L. was put on an airplane from Arizona to New York and taken to MercyFirst, a privately-owned HHS shelter that houses unaccompanied minors.

59.    A.C.L. had never been on an airplane before.  She was distressed upon her arrival in New York – seven-years old, alone, and with no idea where she was or why she was there.

60.    A.C.L. was provided a worksheet informing her of her legal rights and warning her about the risk of sexual assault at the shelter.

61.    She was assigned to a dorm room with two other girls.  At the shelter, A.C.L. did various chores including cleaning, sweeping, vacuuming, and washing dishes.

62.    For A.C.L., the nights were especially difficult.  She was extremely sad and lonely, and missed her family terribly.

63.    During her first month in New York, A.C.L. contracted the *varicella zoster* virus. She had itchy, red blisters all over, her body ached, and she had a fever.  She was then taken to a new shelter for two weeks to recover, where she was isolated from the other children.

64.    During the summer, A.C.L. suffered from swelling in her left eyelid due to an unknown infection.  A doctor treated her for these conditions, but her eye swelling flared up even after she returned home.

65.    A.C.L. had phone calls with her family during the summer.  The staff at MercyFirst noticed her intense emotional reaction to these phone calls.  On June 15, 2018, the staff at MercyFirst began monitoring A.C.L.'s phone calls with her parents because she was becoming so distressed by the phone calls.

66.    A.C.L. repeatedly told the staff at MercyFirst that she wished to return home.

67.     In early July of 2018, A.C.L. reported to her social worker that she struggled with a boy at the shelter who would hit her repeatedly.  As time went on, her social worker noted that she was sad, homesick and frustrated that she remained away from her family.  A.C.L. also told her social worker that she was struggling with some of the other children at the shelter.  The social worker reported that she provided A.C.L. with some "behavior management/control techniques" and "self awareness and grounding techniques."

68.     In September of 2018, A.C.L.'s emotional and social distress had escalated and staff expressed concern about her behavior.  A.C.L. expressed that she wanted to stop attending school.

69.     At approximately three o'clock in the morning on September 19, 2018, MercyFirst staff woke A.C.L. up and took her to an office.  A.C.L. was confused by the commotion in the middle of the night.  At the office, it was explained to her that she was being ordered to leave the country.  A judge issued her voluntary departure order and she got into a car, where a strange man drove her to an airport.

**E.     F.C.C. and His Wife G.L.E. Remain in Honduras, Are Devastated to be Separated From Their Daughter and Desperate to be Reunited**

70.     Throughout this ordeal, A.C.L.'s mother G.L.E. remained in Honduras.  G.L.E. did the best she could to remain indoors and hide from the violence.

71.     A few days after F.C.C. and A.C.L. began their journey, G.L.E. lost contact with them.  She traveled eight hours by bus to the United States' Embassy in Tegucigalpa.  It was there that she learned that F.C.C. was in detention and would be deported, but there was no information about A.C.L.

72.     The same day that F.C.C. was deported, G.L.E. received a phone call from A.C.L.'s caseworker in New York.  The caseworker explained where A.C.L. was and put A.C.L.

on the phone.  A.C.L. cried to her mother that she wanted to come home.  When G.L.E. inquired when A.C.L. could be returned to her family, the caseworker explained that she had to go before a court.  G.L.E. had no idea how long this would take.

73.     G.L.E. called the caseworker in New York every day after 1 p.m., to speak to A.C.L.  These phone calls cost 100 Lempira per conversation, nearly all of F.C.C.'s daily pay.  Olancho does not have reliable phone service or internet connection, so F.C.C. and G.L.E. traveled three towns over to speak with their daughter.  Sometimes the phone call would drop, and they would have to wait until the next day to be able to check in on their daughter.

74.     Approximately every other week, F.C.C. and G.L.E. would travel eight hours to Tegucigalpa to meet with staff at the embassy, the consulate, the media and non-profit organizations – anyone who might be able to help reunite them with A.C.L.  These trips cost them hundreds of Lempira, much of which they would borrow from friends or family.

75.     Throughout the summer, G.L.E. would travel to her mother's village to use a computer, where she would read endlessly about family separation.  She was filled with dread and uncertainty as she learned more.

76.     F.C.C. and G.L.E. heard rumors in their village and on the news that the children that had been separated from their parents after crossing the border were being given up for adoption.  F.C.C. and G.L.E. were terrified that A.C.L. would be adopted and they would never see her again.  They worried that something awful could happen to her while she was not in their care.

77.     Finally, on or about September 17, 2018, over four months after the separation, A.C.L.'s caseworker called G.L.E. and told her that A.C.L. was coming home.  She told G.L.E. to go to the San Pedro Sula airport on or about September 19, 2018.

78.     When F.C.C. and G.L.E. first saw A.C.L. arrive at the airport, they were not allowed to hug her.  Instead, they had to go to an office to formally reunite.  Finally, they were allowed to take their daughter home.

**F.     Ongoing Trauma From the Separation**

79.      F.C.C., G.L.E., A.C.L., and the entire family have suffered immensely from the forced and unnecessary separation of their family.

80.     F.C.C. and G.L.E. have suffered immeasurable pain and heartache as a result of the separation.  For the months that A.C.L. was in New York, they were terrified that she would be adopted.  The thought that they might never see their daughter again was devastating; they cried every day they were without her.  F.C.C. and G.L.E. felt helpless.

81.     The separation caused G.L.E. to suffer from severe anxiety and depression.  She needed to go to a psychiatric hospital to be treated for her symptoms.  She takes medication to cope, but the isolation and hopelessness persist.

82.     A.C.L. and G.L.E. have gone to therapy as a result of the effects of the separation.

83.     After A.C.L. and F.C.C. were forcibly separated, A.C.L. was detained in an unfamiliar place, away from her father.  She did not know where she was, how long she would be there, or when or if she would see her family again.  A.C.L. was devastated during this time.

84.     After returning to her parents, A.C.L. was jumpy and anxious, suffered from frequent nightmares, struggled to sleep, and was wetting the bed.  She has dealt with tantrums and unexplained aggression.  Further, her grades in school suffered.  A.C.L. is being treated by a therapist because of the separation.

85.     F.C.C. has suffered and continues to suffer severe emotional distress because of the forced separation from his daughter.  Since they were separated, F.C.C. has felt the ongoing

and lasting effects of extreme trauma.  It has been especially difficult for him to see A.C.L.'s fear and sadness, and how she has been impacted by the separation.

86.     The trauma of family separation is well-known to have physical manifestations in children in the form of stomach aches, heartaches, headaches, and difficulty toileting.[23] Separated children also suffer from skill regression, communication, and attachment issues.[24] Because this trauma and stress is so severe, legal and medical experts have classified family separation as a form of torture.[25]

87.     Family separation causes toxic stress, which fundamentally alters a person's stress response and cognitive functioning.[26]  When toxic stress occurs during childhood, it can have prolonged and devastating long-term effects, including a greater risk for several health and psychological impairments such as anxiety, depression, post-traumatic stress disorder, lower IQ, obesity, lowered immune system functioning and physical growth, cancer, heart and lung disease, and stroke.[27]

---

[23] Anna Gunther, Children Separated from Fams. at the Border Could Suffer Long-term Health Issues, CBS NEWS, Sept. 18, 2019, https://www.cbsnews.com/news/children-traumatized-after-family-separations-could-suffer-long-term-health-issues-2019-09-18/.

[24] Amanda Holpuch, Trump's Separation of Fams. Constitutes Torture, Doctors Find, GUARDIAN, Feb. 25, 2020, https://www.theguardian.com/us-news/2020/feb/25/trump-family-separations-children-torture-psychology.

[25] Id.

[26] Laura Santhanam, How the Toxic Stress of Fam. Separation Can Harm a Child, PBS NEWSHOUR, Jan. 18, 2018, https://www.pbs.org/newshour/health/how-the-toxic-stress-of-family-separation-can-harm-a-child.

[27] Johayra Bouza et al., The Science is Clear: Separating Fams. has Long-term Damaging Psychological and Health Consequences for Child., Fams., and Cmtys., Soc'y for Research in Child Dev., June 20, 2019, https://www.srcd.org/briefs-fact-sheets/the-science-is-clear.

## CLAIMS FOR RELIEF

### COUNT I

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

88.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

89.     By engaging in the acts described in this Complaint, the federal officers referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

90.     As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

91.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

### COUNT II

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

92.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

93.     The federal officers and officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause injury to Plaintiffs.  The risks of harm from the Government's conduct was known to federal officers and officials or should have been known.

94.     By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care to Plaintiffs.

95.     As a direct and proximate result of the referenced conduct, Plaintiffs suffered severe emotional distress.

96.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for negligence.

## COUNT III

## NEGLIGENCE

97.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

98.     The federal officers and officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

99.     By engaging in the acts alleged, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

100.     As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

101.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence.

## COUNT IV

## LOSS OF CONSORTIUM

102.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

103.     Loss of consortium requires proof of an underlying tort with a loss of society, companionship, care, support, and affection.

104.     Both Plaintiffs suffered a loss of society, companionship, care, support, and affection as a result of Defendant's commission of the other torts alleged in this complaint.

105.    As a result of the Government's intentional infliction of emotional distress and abuse of process, Plaintiffs were separated from a close family member while detained in a foreign country.  Plaintiffs were unable to seek familial companionship, care, support, and affection because Defendant detained them in different facilities.

106.    The Government's negligence prevented Plaintiffs from communicating and slowed their reunification, also depriving Plaintiffs of the ability to seek comfort from each other.

107.    Additionally, the severe emotional trauma on A.C.L. continues to impact her development and has changed her profoundly.  She has become fearful, withdrawn, and anxious. The effect of the separation continues to deprive F.C.C. of the society, companionship, care and affection of his child, A.C.L.

108.    F.C.C. has also suffered severe emotional trauma, and this psychological harm deprives A.C.L. of the society, companionship, care, support and affection of her parent.

109.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for loss of consortium.

## COUNT V

### ABUSE OF PROCESS

110.    The elements of an abuse of process claim are (1) a willful act in the use of a judicial process (2) for an ulterior purpose not proper in the regular conduct of the proceedings. A defendant is liable for abuse of process when the process is used to primarily achieve a purpose for which it was not intended and can arise from all procedures incident to litigation.

111.    The Government used its immigration detention authority which is incident to the judicial process of removal proceedings for the improper ulterior motive of separating families

such as plaintiffs to generate publicity, and for the improper ulterior motive of deterring Plaintiffs from asserting their right to seek asylum.

112.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for abuse of process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand as follows:

A.  Compensatory damages;

B.  Punitive damages;

C.  Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2421 and

D.  Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Dated:  August 25, 2022                                                        Respectfully submitted,


/s/ Matthew K. Handley

Matthew K. Handley
Rachel Nadas, *pro hac vice* forthcoming
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Avenue NW, 7th Floor
Washington, DC 20016
(202) 559-2411
mhandley@hfajustice.com
rnadas@hfajustice.com